UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CANDIDO BAEZ,

                Plaintiff,

         v.

DR. LESLEY MALIN, *et al.*,

                Defendants.

No. 18-CV-2850 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances:</u>

Candido Baez
Coxsackie, NY
*Pro se Plaintiff*

Jennifer R. Gashi, Esq.
State of New York Office of the Attorney General
White Plains, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

       Pro se Plaintiff Candido Baez ("Plaintiff"), currently incarcerated at Greene Correctional

Facility ("Greene"), brings this Action pursuant to 42 U.S.C. § 1983, the Americans with

Disabilities Act ("ADA"), and the Rehabilitation Act, against numerous Department of

Corrections and Community Services ("DOCCS") officials at Sing Sing Correctional Facility

("Sing Sing") and Greene Correctional Facility ("Greene") (collectively, "Defendants"). (*See*

Am. Compl. (Dkt. No. 56).)[1] Plaintiff also appears to claim that certain Defendants made false

---

       [1] Defendants are: Dr. Lesley Malin ("Malin"); Anthony Annucci ("Annucci"); Michael
Capra ("Capra"); LaMarr Banks ("Banks"); Dawn Mason ("Mason"); Shaunte Mitchell
("Mitchell"); Jeffery A. Hale ("Hale"); Quandera Quick ("Quick"); Jacqueline Reid ("Reid");
Patti Bartleson ("Bartleson"); Stacey Dugon ("Dugon"); Brandon J. Smith ("B. Smith"); Marie
Hammond ("Hammond"); Dr. Doreen Smith ("D. Smith"); Ms. Karen M. Cole ("Cole"); Jose

statements related to healthcare matters under 18 U.S.C. § 1035, a criminal statute. (*See id.* ¶ 79; *id.* at 62–64, 67.)[2]

Before the Court is Defendants' Motion To Dismiss (the "Motion"), pursuant to Rules 12(b)(3) and 12(b)(6) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1404(a). (Defs.' Not. of Mot. ("Not. of Mot.") (Dkt. No. 67).) For the reasons explained herein, Defendants' Motion is granted in part and denied in part.

---

Reyes ("Reyes"); Francis Steinbach ("Steinbach"); Thomas Mauro ("Mauro"); James Gambino ("Gambino"); Nancy Heywood ("Heywood"); Wesley TenEyck ("TenEyck"); Jeanette J. Vogel ("Vogel"); Sarah Crockwell ("Crockwell"); Jeff McKoy ("McKoy"); Anne Marie McGrath ("McGrath"); Megan MacTavish ("MacTavish"); Mary Vann ("Vann"); Karen Bellamy ("Bellamy"); John Kusisto ("Kusisto"); Michael Vulcano ("Vulcano"); and Kevin Bruen ("Bruen").

    Defendants provide the full names of each Defendant in their Memorandum of Law. (Defs.' Mem. of Law in Supp. of Mot. ("Defs.' Mem.") 1 (Dkt. No. 68).) The Court uses the names provided by Defendants here. Defendants also provide the professional titles of some Defendants. (*Id.*) The Court uses the titles provided by Defendants in this Opinion, but where a title is not provided by Defendants, the Court uses the title provided in Plaintiff's Amended Complaint.

    Finally, Defendants note that Defendant "Bink," as named in Plaintiff's Amended Complaint, is Senior Rehabilitation Counselor Sarah Crockwell, and "Ms. D. Hammon," as named in Plaintiff's Amended Complaint, is Ms. Marie Hammond. (*Id.* at 1 nn.1–2.) Thus, the Court refers to these Defendants as "Crockwell" and "Hammond."

[2] The statement of facts portion of Plaintiff's Amended Complaint includes consecutively numbered paragraphs. Although later portions of the Amended Complaint also include numbered paragraphs, these paragraphs are renumbered starting at one. To avoid confusion, the Court uses paragraph numbers to cite to the statement of facts and page numbers to refer to any portions of the Amended Complaint before or after the statement of facts.

# I.  Background

## A.  Factual Background

The following facts, drawn from Plaintiff's Amended Complaint, are assumed to be true for the purposes of this Motion.  The Court recounts only the facts that are necessary in deciding the instant Motion.[3]

### 1.  Incarceration at Sing Sing Correctional Facility

Plaintiff is 52 years old and has been in DOCCS custody since March 12, 1990.  (Am. Compl. ¶ 1.)  He has an "exemplary disciplinary and program record."  (*Id.*)  Plaintiff has committed no Tier III disciplinary infractions since August 1995, and last committed Tier II infractions in 2000 and 2012.  (*Id.*)  On September 28, 2015, Plaintiff was an inmate at Sing Sing.  (*Id.* ¶ 2.)  While there, Plaintiff was housed in the "Honor Block Housing Unit" "due to his exemplary behavior and programming record."  (*Id.* ¶ 3.)  As a resident of this unit, Plaintiff received certain privileges, such as preparing his own food and daily showers.  (*Id.*)  Plaintiff also "maintain[ed] a two module program as a Law Library bilingual . . . lock runner," meaning that he translated legal letters and materials for non-English speakers and delivered legal materials to inmates confined to their cells, hospital units, or mental health units.  (*Id.* ¶ 5.)  This position required Plaintiff to "walk up and down . . . [a] steep hill" several times a day and to carry a full bag of books and materials up several flights of stairs for several years.  (*Id.* ¶ 84.)  Beginning in 2012, Plaintiff also volunteered as an "Alternative to Violence Facilitator."  (*Id.* ¶ 5.)

---

[3] For example, Plaintiff quotes throughout his Amended Complaint portions of various policies and DOCCS directives.  (*See, e.g.*, Am. Compl. ¶ 79.)  Because the substance of these policies and directives is not at issue in the instant Motion, the Court does not discuss them in detail here.

Because of Sing Sing's proximity to New York City, while there, Plaintiff received visits and "moral support" from his family, including his "elders," and his son, daughter, and grandchildren, who live in Newport, Virginia and traveled to New York. (*Id.* ¶ 4.) Plaintiff also "earned the privilege" to participate in the Family Reunion Program ("FRP"), which was "designed to provide[] approved inmates and their families the opportunity to meet for an[] extended period of time in . . . privacy." (*Id.* ¶ 6.) On February 11, 2013, Plaintiff submitted his FRP application for processing. (*Id.* ¶ 7.) However, Parole Officer Mason, who processed the application, took 31 days to give the FRP application to Plaintiff's Offender Rehabilitation Coordinator ("ORC"), and it took another 13 days for the application to be reviewed by other staff members, thus completing the "facility[-]level FRP application process." (*Id.*) On April 4, 2013, Mason forwarded Plaintiff's FRP application to the "Central Office" for "further review." (*Id.*) Plaintiff did not hear from Mason until July 30, 2013 when, in response to a letter from Plaintiff, Mason informed him that certain information had been missing from his application and that the application was being re-reviewed. (*Id.* ¶ 8.) Plaintiff had been under the impression that his original application was complete, and on August 1, 2013, he asked Mason what information was missing and how long the review would take, and also requested a copy of the letter from the Central Office flagging the missing information. (*Id.* ¶ 9.) On August 6, 2013, Mason replied that the letter had been returned to the Central Office, that she did not know how long the review would take, and that Plaintiff's "coordinator" had not filled out certain information. (*Id.* ¶ 10.)

According to Plaintiff, his FRP application process involved "weeks and months of unnecessary delays." (*Id.* ¶ 15.) On August 12, 2013, Plaintiff sent Deputy Superintendent for Program Malin a letter complaining about the delay in the processing of his FRP application,

which Malin forwarded to Mason.  (*Id.* ¶ 12.)  Mason responded on August 26, 2013.  (*Id.*)  On

September 26, 2013, Plaintiff again spoke with Mason about the delay, and Mason responded

that she had too many other responsibilities.  (*Id.* ¶ 13.)  Thus, on September 30, 2013, Plaintiff

filed a grievance against Mason.  (*Id.*)  On January 8, 2014, Plaintiff requested from Mason the

"[p]ink copy" of his FRP application, which is meant to be returned to the inmate, but five days

later, Mason informed Plaintiff that he would need to file and pay for a FOIL request to obtain

the copy.  (*Id.* ¶ 14 & n.5.)  At the end of January, Plaintiff told Mason that he had learned from

his Coordinator that his FRP application was on the bottom of the stack, and applications

submitted after his were on top of it.  (*Id.* ¶ 16.)

On November 9, 2014, Plaintiff was allowed to attend an FRP visit, and he immediately

applied for another one.  (*Id.* ¶ 19.)  On December 4, 2014, Plaintiff once again complained to

Mason about the delays in processing his application.  (*Id.* ¶ 17.)  Mason responded on

December 15, 2014, and Plaintiff's application was processed on December 17, 2014.  (*Id.*

¶¶ 18–19.)  Soon after, Plaintiff's wife called to schedule a visit, which Mason scheduled for

February 17, 2015.  (*Id.*)  However, Mason also scheduled several FRP visits for other inmates

ahead of Plaintiff's visit, even though these inmates had participated in FRP visits after the date

of Plaintiff's first visit.  (*Id.*)  Thus, on January 12, 2015, Plaintiff wrote a letter to Mason,

alleging that she did not assign FRP visits on a "first[-]come[,] first[-]serve basis," that she was

discriminating against Plaintiff and his family, and that she was "arbitrar[ily] and capriciously

denying Plaintiff and [his] family equal protection, access, and participation [in] the FRP."  (*Id.*

¶ 20.)  On January 16, 2015, while Plaintiff was in his quarterly interview with Parole Officer

Banks, Mason "quickly and aggressively" informed Plaintiff that she would not reply to his

letter.  (*Id.* ¶ 21.)  On January 20, 2015, Plaintiff complained by letter to Superintendent Capra

about his exchange with Mason, but Capra "neglected" the complaint and forwarded Plaintiff's letter to Mason.  (*Id.* ¶¶ 22–23.)  On January 28, 2015, Mason denied the allegations in Plaintiff's letter.  (*Id.* ¶ 23.)

On February 4, 2015, Plaintiff spoke to Malin about Mason's conduct.  (*Id.* ¶ 25.) According to Plaintiff, Malin "admitted" that Mason processed FRP applications once she received a number of them, instead of doing so upon receipt, and that once the applications were approved, families who called in first received the first FRP visit days.  (*Id.*)  Plaintiff recorded the contents of this conversation in a letter, to which Malin responded on February 10, 2015, claiming that Mason processed applications weekly and that Malin had not seen any inmates' applications processed "weeks ahead" of any other inmates' applications.  (*Id.* ¶ 26.)  Malin also informed Plaintiff that FRP visits are occasionally cancelled; thus, a family who called after Plaintiff's family could have received an earlier FRP date due to a later cancellation.  (*Id.*)  On February 27, 2015, Plaintiff filed a grievance related to the conduct and responses of Capra, Malin, and Mason "from November 9, 2014 through February 10, 2015," alleging that these Defendants engaged in "discriminat[ory], arbitrary[,] and capricious misconduct[] [that] impaired the fairness and equal opportunity [of] Plaintiff and his family to participate in the FRP visit and integrity of the program."  (*Id.* ¶ 28.)

### 2.  Plaintiff's Program Removal

On August 5, 2015, Plaintiff received a memorandum from Senior Counselor Bartleson stating that Plaintiff would be removed from his "program," which appears to have been his position in the law library, because of the length of time Plaintiff had been in the program, and because such a change was in the "Department's best interest."  (*Id.* ¶¶ 29, 35.)  According to Plaintiff, he was unable to challenge the removal because he was not informed that it was

"negative," but he later learned from Senior ORC Vulcano at Greene that his removal was, in fact, "negative." (*Id.* ¶ 30 & n.8.) Plaintiff was removed from the program on August 9, 2015 and was asked to choose between two "porter" positions. (*Id.* ¶ 30.) On August 13, 2015, Plaintiff filed a grievance, claiming that his removal from the program was in violation of various policies, guidelines, and procedures; for example, Plaintiff did not receive counseling before the removal. (*Id.* ¶¶ 30, 32.) No investigation was conducted before issuing a decision on his grievance. (*Id.* ¶ 33.) Plaintiff appealed his grievance, and on September 24, 2015, Capra denied the appeal. (*Id.* ¶ 34.)

### 3. Plaintiff's Transfer to Greene

On September 25, 2015, Plaintiff was transferred to Greene "in retaliation for filing grievances." (*Id.* ¶ 36.) Other inmates who were transferred from Sing Sing at the same time were sent to "medium security facilities within the Downstate region." (*Id.*) Greene does not have an FRP program, and the distance between Greene and Plaintiff's family makes it difficult to "maintain family support," and for his family to participate in the "regular visit program." (*Id.* ¶¶ 37, 88.) According to Plaintiff, Greene has "fewer privileges than every maximum and medium level security [c]orrectional [f]acility within the [S]tate of New York"; for example, Plaintiff must wear a "state issue green uniform and state boots," even when it rains and his clothing and boots become wet. (*Id.* ¶¶ 38–39.) According to Plaintiff, this constitutes "cruel and unusual punishment" because he is "susceptible to foot fungus." (*Id.* ¶ 40.)

At Greene, Plaintiff is also "subjected to longer walks" than he has experienced in other facilities. (*Id.* ¶ 85.) For example, from November 2015 through June 2016 and August 2016 through July 2017, Plaintiff had to walk approximately a mile to see his counselor and four blocks in inclement weather to get to the "mess[]hall" and his "assignment program." (*Id.*).

Further, Plaintiff alleges that at Greene, inmates are "imposed[,] sanctioned[,] and deprived of privileges without any sort of due process for action[s] they did not commit," investigations into inmate allegations are not conducted, and misbehavior reports are not written or shown to the inmates. (*Id.* ¶¶ 41–42.) Plaintiff also argues that Greene's "Community Life Styles ('CLS') program" promotes violence and abuse and is a tool used by officers to impose "arbitrary and capricious[]" sanctions on inmates. (*Id.* ¶¶ 41, 46–47.) Inmates cannot sign out of or withdraw from CLS, and they are not paid for participating in the program. (*Id.* ¶ 49.) Plaintiff has been sanctioned several times at Greene "without any sort of due process." (*Id.* ¶ 48.)

### 4. Plaintiff's Incarceration at Greene

#### a. Transfer Grievances

On September 28, 2015, Plaintiff arrived at Greene. (*Id.* ¶ 52.) Two weeks later, he was interviewed by Supervising ORC Dugon. (*Id.*) Plaintiff informed Dugon that he had been unable to select a preferred transfer closer to his family, which Plaintiff stated was in violation of certain departmental directives and a memorandum issued by, among others, Associate Commissioner McKoy. (*Id.*) Plaintiff explained that it would be difficult for his family members to travel to Greene due to his wife's "severe back pain and poor eyesight" and his "elder[] uncles and aunts." (*Id.*) After reviewing Plaintiff's disciplinary record, Dugon told Plaintiff that he should have received a "continuance area of preference transfer to a medium security level facility of his choice," but that because Plaintiff was already at Greene, he could only transfer to facilities that were further north or west 90 days after his arrival. (*Id.* ¶ 53.) On October 10, 2015, Plaintiff filed a grievance alleging that his transfer was "arbitrary, capricious[][,] and in retaliation for filing several grievances at . . . [Sing Sing]." (*Id.* ¶ 55.) The "Grievance Committee" denied Plaintiff's grievance on November 10, 2015. (*Id.* ¶ 56.) In

doing so, the Grievance Committee relied on an investigation conducted by Vulcano, who "falsely claimed" that Plaintiff was "disqualified for an area of preference transfer" because his August 9, 2015 removal from the law library was considered to be a negative removal. (*Id.*) However, once Plaintiff "established through documentation" that he had not been negatively removed from the law library program, Defendants claimed that Plaintiff's transfer was because he needed the "reasonable accommodation of a flat facility," which was based on "false and misleading assertion[s]" that Plaintiff had trouble walking long distances and on stairs. (*Id.* ¶ 62.)

According to Plaintiff, he does not have trouble walking long distances or up and down stairs. (*Id.* ¶ 65.) However, Plaintiff does suffer from numbness in his feet when he is lying in bed or sitting on hard surfaces, (*id.* ¶ 63), and he has received cortisone shots in his back to relieve the condition, (*id.* ¶ 66). In October or November 2015, Plaintiff met with Dr. D. Smith for his first medical evaluation. (*Id.* ¶ 67.) D. Smith told Plaintiff that if he continued to receive cortisone treatments, he would be unable to transfer to a facility closer to home due to a "medical hold." (*Id.*) Plaintiff then declined the cortisone treatment until he could be transferred to a different facility. (*Id.*)

Plaintiff moved to appeal the denial of his grievance to Superintendent B. Smith on November 10, 2015 by mailing his appeal to Prisoner's Legal Services ("PLS") "and other agencies." (*Id.* ¶ 58.) On November 20, 2015, McKoy acknowledged that he had received Plaintiff's appeal and "encouraged Plaintiff to be patient and allow the [g]rievance process to continue." (*Id.* ¶ 59.) On November 24, 2015, PLS confirmed receipt of the appeal. (*Id.*) However, when Plaintiff wrote to Grievance Supervisor Kusisto on December 6 and 8, 2015 to ask about the status of his grievance, Kusisto responded that he had not received the appeal. (*Id.*)

On December 10, 2015, Plaintiff complained to the Central Office Review Committee ("CORC") about "the denial of his due process right to seek further remedy upon appeal of . . . his grievance," (*id.* ¶ 60), and on December 21, 2015, Plaintiff complained to Commissioner of Transfer and Movement Gambino about his allegedly retaliatory transfer, (*id.* ¶ 61). On January 27, 2016, Director of Inmate Grievance Program Bellamy affirmed Kusisto's decision, and Gambino ignored Plaintiff's complaint. (*Id.* ¶¶ 60, 61.)

On January 5, 2016, Dugon informed Plaintiff that he had been transferred from Sing Sing to Greene because of an alleged need for a flat facility. (*Id.* ¶ 68.)[4] Thereafter, Plaintiff requested his medical records, which were heavily redacted but stated that he required a flat facility. (*Id.* ¶ 69.) On January 7, 2016, Plaintiff complained to McKoy about the transfer, arguing that he did not have medical needs that necessitated a flat facility. (*Id.* ¶ 71.) Further, on January 28, 2016, when Plaintiff met with D. Smith, she concluded that Plaintiff did not have a walking impairment or any need to be in a flat facility. (*Id.* ¶ 70.) D. Smith agreed to relay this information to Dugon, and Plaintiff wrote to Dugon as well, requesting an "area of preference transfer." (*Id.*) Dugon did not respond. (*Id.*) On February 16, 2016, Plaintiff sent a letter to Acting Commissioner Annucci regarding his "arbitrary and capricious transfer"; the false medical reasons behind his transfer; the deprivation of participation in the FRP program; the issues with wet clothing and boots at Greene; and the "arbitrary and capricious[] sanction[s]" for the actions of other inmates. (*Id.* ¶ 78.) According to Plaintiff, he noted in the same letter that he had been discriminated against in violation of the ADA and Rehabilitation Act because Greene

---

[4] Plaintiff later appears to explain that MacTavish and Vann had a role in reviewing Plaintiff's medical report and deciding that he needed to be transferred to a flat facility. (Am. Compl. ¶ 83.)

does not have an FRP program, and Plaintiff has received no "reasonable accommodations or efforts." (*Id.* ¶¶ 78, 87.) Annucci did not respond. (*Id.*)

On February 23, 2016, Plaintiff filed another grievance, stating that his "medical transfer" was in violation of departmental directives and the ADA, Rehabilitation Act, and 18 U.S.C. § 1035(a)(1)–(2), the "Crime and False Statement Law." (*Id.* ¶ 79.) Plaintiff also alleged that three other facilities closer to New York City could have accommodated his purported walking impairment—Fishkill Correctional Facility ("Fishkill"), Woodburn Correctional Facility ("Woodburn"), and Wallkill Correctional Facility ("Wallkill"). (*Id.* ¶ 80.) According to Plaintiff, the fact that he was not transferred to one of these facilities violated certain DOCCS directives. (*Id.* ¶ 82.) Plaintiff's grievance was denied on February 25, 2016 because it "could not be substantiated that . . . [the] transfer was based solely on [Plaintiff's] medical history," and it may also have been "for program purposes." (*Id.* ¶ 90.) B. Smith affirmed this denial on March 4, 2016. (*Id.* ¶ 91.)

On May 16, 2016, Associate Commissioner McGrath, "[p]er referral of . . . Annucci and McKoy," "falsely claimed" that Plaintiff was transferred to Greene because of his "mobility needs." (*Id.* ¶ 72.) On January 24, 2017, Plaintiff sent another letter to McKoy about his transfer and noted differences between his treatment and the treatment of other inmates. (*Id.* ¶¶ 73–74.) On February 22, 2017, "per reference of . . . McKoy," McGrath responded that Plaintiff's records indicated that he had been transferred due to his need for a flat facility and thus, his transfer to Greene was appropriate. (*Id.* ¶ 75.) On March 14, 2017, also "per referral of . . . McKoy," McGrath sent Plaintiff another letter stating that Greene was a "terminal facility," and as such, Plaintiff could only request transfers to facilities that were further north or further west. (*Id.* ¶ 76.) On April 17, 2017, during his quarterly interview with ORC TenEyck, Plaintiff

requested an "area of preference transfer" to be closer to New York City and his family.  (*Id.* ¶ 100.)  TenEyck informed Plaintiff that inmates from the New York City area, who Plaintiff states are "75 to 80 percent of DOCCS inmates' population, and are mostly Black and Hispanic," are not allowed to request transfers closer to New York City.  (*Id.* ¶ 102.)  However, according to Plaintiff, inmates who live in the northern or western regions of New York State, and who are mostly white, are able to request area of preference transfers closer to their homes.  (*Id.*)

Plaintiff also alleges that Grievance Supervisor Mauro did not forward Plaintiff's materials to the "ADA Coordinator" in the Central Office, in violation of Plaintiff's due process right to a "review of [his] accommodation[s] and grievance determination[s]."  (*Id.* ¶ 94.)  According to Plaintiff, documentation related to reasonable accommodations must be kept for three years after the date of disposition, and such decisions should be sent to the ADA Coordinator for review.  (*Id.* ¶ 93.)  On April 20, 2017, Plaintiff asked Mauro whether he had forwarded Plaintiff's grievance to the ADA Coordinator.  (*Id.* ¶ 94.)  Mauro responded the following day, stating that he did not do so because Plaintiff had not submitted a request for reasonable accommodation.  (*Id.* ¶ 95.)  Thereafter, Plaintiff filed a grievance against Mauro on May 1, 2017.  (*Id.* ¶ 96.)  On May 5, 2017, Mauro emailed Plaintiff's records to the ADA Coordinator.  (*Id.*)  Plaintiff filed another grievance on May 7, 2017, claiming that the policy barring New York City-area inmates from requesting transfers closer to New York City was "racist, bias[ed][,] and discriminat[ory] against inmates" who are mostly black and Hispanic, and inconsistent with DOCCS directives and policies.  (*Id.* ¶ 103.)  On July 13, 2017, Inmate

Grievance Supervisor Hale "upheld the Superintendent's determination," stating that Plaintiff had been transferred for program purposes and his back issues. (*Id.* ¶ 92.)[5]

On May 30, 2017, Plaintiff requested that Mauro transfer his grievance to B. Smith. (*Id.* ¶ 104.) When Plaintiff did not receive a response from B. Smith, he requested that Mauro send his grievance to CORC for resolution on June 23, 2017, which Mauro confirmed he had done. (*Id.*) On June 28, 2017, Plaintiff received a decision from B. Smith denying Plaintiff's grievance and stating, "Per Classification and Movement[,] inmates who meet the criteria for Area of Preference Transfer may request an area of preference transfer to any hub EXCEPT Greene Haven or Sullivan." (*Id.* (quotation marks omitted).) B. Smith's decision also noted that Plaintiff's grievance would be sent to CORC for a "final disposition." (*Id.*) Plaintiff appealed this determination. (*Id.*) According to Plaintiff, seven months elapsed, and CORC did not provide Plaintiff with a decision in the time frame dictated by DOCCS directives. (*Id.* ¶ 105.)

### b. FOIL and HIPAA Requests

On January 1, 2016, Plaintiff submitted a FOIL request seeking certain documents from Capra related to Plaintiff's transfer to Greene. (*Id.* ¶ 106.) On January 15, 2016, FOIL Officer Mitchell responded, denying in full or in part all of Plaintiff's requests. (*Id.* ¶ 107.) Mitchell granted disclosure of a four-page "Scheduling Transfer Review," which listed the names of Sing Sing employees who "submitted Plaintiff's transfer to the GCF" and included information on Plaintiff's suitability for "any security medium [four] facility." (*Id.* ¶ 108.) Plaintiff mailed payment for these documents to Mitchell on February 2, 2016, and Mitchell sent the Scheduling Transfer Review to Plaintiff on March 24, 2016. (*Id.* ¶ 109.) On February 7, 2016, Plaintiff

---

[5] Given the timing, it is unclear whether Hale's decision, (Am. Compl. ¶ 92), relates to Plaintiff's May 7, 2017 grievance or another grievance or letter from Plaintiff.

appealed Mitchell's denial of certain of Plaintiff's document requests. (*Id.* ¶ 110.) On June 8, 2016, Deputy Counsel Heywood affirmed Mitchell's determinations. (*Id.*)

On January 5, 2016, Plaintiff requested from Registered Nurse Administrator Cole copies of all medical records related to his transfer to a flat facility, and also sought revocation of the request for his transfer to a flat facility. (*Id.* ¶ 111.) On January 25, 2016, Plaintiff received two pages of documents from Medical Department Member Vogel, portions of which were redacted. (*Id.* ¶ 112.) On February 25, 2016, Plaintiff wrote another letter to Cole, attaching a "HIPAA request" and asking that the "false allegation" regarding his walking impairment be removed from his medical files, and that the "medical hold" be lifted. (*Id.* ¶¶ 113–14.) In the same letter, Plaintiff requested copies of all medical records from Sing Sing related to his alleged walking issues, the recommendation that he be transferred to a flat facility, and any policies or procedures that governed his transfer. (*Id.* ¶¶ 114–15.) Cole "ignored" this request, and Plaintiff filed a grievance against her on March 29, 2016. (*Id.* ¶ 115.)

On April 5, 2016, Plaintiff submitted the same "HIPAA request" to B. Smith. (*Id.*) Nine days later, Deputy Superintendent for Administration Steinbach responded to the letter on behalf of B. Smith, informing Plaintiff that "there [wa]s no document to support Plaintiff's claim[] that he ha[d] a medical hold," and that Plaintiff had already received medical information from the Inmate Record Department in response to his original request on January 5, 2016. (*Id.* ¶ 116.) Steinbach also informed Plaintiff that they did not have the names of the Sing Sing employees who recommended the transfer and that Plaintiff's other requests were being investigated. (*Id.*) On April 21, 2016, Plaintiff informed Steinbach via a letter with attached documentation that he was under the impression from Dugon that he was on a "medical hold" and thus could not be transferred closer to New York City, and that Plaintiff believed that he met all criteria set forth in

McKoy's "Memorandum" for an "area of preference transfer." (*Id.* ¶ 117.) On May 6, 2016, Steinbach informed Plaintiff that Greene does not transfer inmates to the south, and noted that Plaintiff had turned down a transfer to the north or west. (*Id.* ¶ 118.) Plaintiff alleges that in actual fact, Dugon offered him a transfer from Greene to a more northern or western facility if Plaintiff agreed to sign an "unauthorized waiver [form]." (*Id.* ¶ 119.)

On May 30, 2016, Plaintiff wrote another letter to B. Smith, again requesting copies of his medical records, and attached relevant documents and policies. (*Id.* ¶ 120.) The following day, Plaintiff submitted a notarized letter "challeng[ing] the accuracy of his medical record" under § 4.10(IV)(G)(1) of the DOCCS Health Services Policy Manual. (*Id.* ¶ 121.) Plaintiff's letter also stated that Cole had provided "false and misleading information" to Mauro in an email about Plaintiff's medical chart and his ability to "do stairs [and] long distance." (*Id.* ¶¶ 120–21.) On the same day, Plaintiff requested by letter to Access Records Officer Reyes that the "erroneous information in his medical file" be corrected. (*Id.* ¶ 122.) On June 6, 2016, Reyes informed Plaintiff that he had forwarded the request to Cole, but Cole did not respond or amend the information in Plaintiff's medical file. (*Id.* ¶ 123.)

On July 11, 2016, Plaintiff filed a grievance related to the various "HIPAA requests" that he sent to Cole, B. Smith, and Reyes between February and May 2016. (*Id.* ¶ 124.) Mauro assigned a grievance number to Plaintiff, but did not take further steps to process the grievance. (*Id.* ¶ 125.) On August 4, 2016, Plaintiff "moved" to have his grievance forwarded to B. Smith. (*Id.*) On January 6, 2017, B. Smith denied Plaintiff's grievance, noting that Steinbach, who conducted an investigation, determined that Plaintiff was provided with the documents he requested. (*Id.* ¶ 126.) Plaintiff appealed this decision. (*Id.*) On June 2, 2017, Bellamy notified Plaintiff that she had received his grievance, but Bellamy did not issue a timely determination.

(*Id.* ¶¶ 127–28.) On June 26, 2017, Plaintiff explained to Steinbach that he had been transferred to Greene based on "false allegations" about his medical needs and negative removal from his program at Sing Sing. (*Id.* ¶ 129.) Steinbach "took a good look" at Plaintiff and noted that he did not have any problems walking. (*Id.* ¶ 130.) Steinbach recommended that Plaintiff record his complaints in writing, which Plaintiff did on the same day. (*Id.*) On June 30, 2017, Steinbach informed Plaintiff that his transfer to Greene was not based on medical needs, but that instead, Plaintiff's placement at Greene was appropriate "for program needs." (*Id.*) According to Plaintiff, this statement contradicted earlier statements by Dugon and Cole. (*Id.* ¶ 131.) Plaintiff wrote to Steinbach about these inconsistencies on July 21, 2017, but Steinbach did not respond. (*Id.* ¶ 133.)

On July 10, 2017, Plaintiff again requested his medical records. (*Id.* ¶ 134.) Vogel acknowledged the request and informed Plaintiff of the cost for the records, which Plaintiff paid on the same day. (*Id.* ¶¶ 134–35.) On July 26, 2017, Plaintiff received 80 pages of medical records from Vogel that covered the period up until his transfer to Greene. (*Id.* ¶ 135.) None of the records mentioned a walking impairment, and instead, "a number of" the records related to numbness that Plaintiff suffered in his left leg and foot that made certain positions, such as sleeping, difficult to maintain. (*Id.*) One of the records stated that Plaintiff "ambulate[d] without assistance." (*Id.*) According to Plaintiff, Vogel failed to comply with other items in Plaintiff's request and did not provide a reason for doing so. (*Id.* ¶ 136.) Plaintiff appealed this "constructive denial of his request" to Counsel Bruen on August 18, 2017 and sent a similar letter to Cole on August 21, 2017. (*Id.*) On August 23, 2017, Vogel informed Plaintiff that she fully complied with his request. (*Id.*)

During the first week of October 2017, ORC Crockwell conducted Plaintiff's semi-annual interview for "possible eligibility for [an] area of preference transfer." (*Id.* ¶ 150 (alteration removed).) Crockwell told Plaintiff that he qualified for a transfer because he had a positive record at Greene, and informed him that she would submit his application to transfer to a facility closer to New York City. (*Id.*) On October 20, 2017, however, Crockwell informed Plaintiff that she had been told not to submit the request to "either the Green Haven or Sullivan [h]ubs, [but] only further away from his family towards the [n]orthern or [w]estern [h]ubs," and to do so only if Plaintiff signed a transfer waiver. (*Id.* ¶ 151.) Crockwell also told Plaintiff that he had been transferred to Greene because he "need[ed] to take Transitional Services Program Phase III," which, according to Plaintiff, is offered at all DOCCS facilities and is only available to inmates who have been granted parole and are within 120 days of their release date, which Plaintiff was not when he transferred to Greene. (*Id.* ¶ 153.)

On October 10, 2017, McGrath informed Plaintiff that his grievance of May 5, 2016, related to Plaintiff's HIPAA request, had been denied. (*Id.* ¶ 137.) On October 23, 2017, in response to a HIPAA request by Plaintiff from three days earlier, Vogel allowed Plaintiff to review his medical file. (*Id.* ¶ 138.) Vogel informed Plaintiff that she had not seen anything in the file related to walking impairments, and also told him that she did not observe any evidence of such impairments. (*Id.* ¶¶ 138, 140.) Plaintiff showed Vogel the page in his records stating that he could "ambulate without assistance." (*Id.* ¶ 140.) One week later, Vogel called Plaintiff to Greene's medical clinic to administer his flu shot. (*Id.* ¶ 141.) When Plaintiff arrived at the clinic, he saw Cole, and asked her about her February 14, 2016 message to Mauro, which was in Plaintiff's medical file and stated that Plaintiff had difficulty walking. (*Id.*) Plaintiff asked Cole where she obtained the "false information" about his walking impairment, to which she

responded that she "d[id] not have to explain anything to Plaintiff" and told him to "leave immediately." (*Id.* ¶ 142.)

According to Plaintiff, he has not been medically treated for any walking issues or disabilities while at Greene, and he only takes medication for "dangerously agitated" blood pressure, which is caused by the distance from his family, inability to participate in FRP visits, sanctions that he receives for the actions of other inmates, and secondhand smoke from inmates who smoke cigarettes in their dorms, which is described in more detail below. (*Id.* ¶ 146.) Plaintiff further alleges that he was classified as a Medical Service Level ("MSL") 3, which means that he could be housed at any DOCCS facility. (*Id.* ¶ 148.)

### c. Indoor Smoking Policy and Other Conditions of Confinement

From September 28, 2015 until at least the time Plaintiff filed the Complaint in 2018, Plaintiff "was subjected to severe thick clouds of second[hand] tobacco smoke" while in various areas of his dormitory at Greene. (*Id.* ¶ 154.) According to Plaintiff, most of the corrections officers are smokers, and they encourage inmates to smoke in the bathroom. (*Id.*) Plaintiff says that the inmates smoke cigarettes, cigars, and "self-rolling" cigarettes. (*Id.*) The smoke causes Plaintiff to have trouble breathing in the bathroom, which subsequently causes him to avoid using the bathroom until necessary, resulting in "severe[] soreness [in] his [pubic] area." (*Id.* ¶ 155.) Plaintiff also suffers from "a great deal of frustration, stress, headaches, and fatigue" from the smoke, and claims that his life is in danger. (*Id.*) When Plaintiff told D. Smith about the smoke and his concerns that it would "re[injure] his hernia," D. Smith checked Plaintiff's blood pressure, which was "dangerously rising," and increased the dose of his medication. (*Id.* ¶ 156.) Plaintiff did not file a grievance about the smoke because of the large number of smokers, including officers, compared to non-smokers. (*Id.* ¶ 157.) Plaintiff was concerned that

the officers would retaliate against him for filing a grievance, as he had observed the officers' reactions to other inmates who complained about the conditions. (*Id.* ¶¶ 157–59.)

### B.  Procedural Background

Plaintiff filed his original Complaint on March 30, 2018.  (*See* Compl. (Dkt. No. 2).) Plaintiff's request to proceed in forma pauperis ("IFP") was granted on July 9, 2018.  (Dkt. 6.) On July 13, 2018, the Court directed service on the Defendants named in Plaintiff's original Complaint.  (Dkt. No. 8.)  After receiving an extension to file an Answer, Defendants' counsel notified the Court that as of December 12, 2019, Bartleson, Mitchell, and Kusisto had not been properly served.  (Dkt. No. 49.)  Defendants' counsel also noted that the two John Doe Defendants had been identified as MacTavish and Vann.  (*Id.*)  Thus, on December 17, 2018, the Court issued a new Order of Service on the improperly served and newly identified Defendants. (Dkt. No. 51.)  The Court also directed Plaintiff to amend his Complaint to include MacTavish and Vann, and to include an address for Kusisto.  (Dkt. No. 50.)  Plaintiff provided Kusisto's address in a letter docketed on January 8, 2019, (Dkt. No. 53), and the Court directed service on this Defendant on January 12, 2019, (Dkt. No. 55).

On February 4, 2019, Plaintiff filed an Amended Complaint replacing the John Doe Defendants with MacTavish and Vann.  (Dkt. No. 56.)  Pursuant to the Court's individual rules, Defendants filed a Pre-Motion Letter on February 11, 2019, (Dkt. No. 58), and the Court set a briefing schedule for Defendants' Motion To Dismiss, (Dkt. No. 60).  Plaintiff subsequently submitted objections to Defendants' Pre-Motion Letter, and the Court directed Plaintiff to include his arguments in opposition to Defendants' Motion.  (Dkt. No. 62.)  On March 25, 2019, Defendants filed the instant Motion.  (Not. of Mot.; Defs.' Mem.)  On April 22, 2019, Plaintiff filed an Opposition to the Motion.  (Pl.'s Mem. of Law in Opp'n to Mot. ("Pl.'s Mem.") (Dkt.

No. 69).)  On May 15, 2019, Defendants filed a Reply.  (Defs.' Reply Mem. of Law in Supp. of Mot. ("Defs.' Reply") (Dkt. No. 70).)

## II.  Discussion

### A.  Standards of Review

#### 1.  Rule 12(b)(6)

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id*. (alteration and quotation marks omitted).  Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id*. at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id*. at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id*.; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not

'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id*. at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In considering Defendants' Motion, the Court is required to "accept as true all of the factual allegations contained in the [C]omplaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (same). And, the Court must "draw[] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Where, as here, a plaintiff proceeds pro se, the Court must "construe[] [his complaint] liberally and interpret[] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (per curiam) (quotation marks omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedure and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and quotation marks omitted)).

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted). However, when the complaint is drafted by a pro se plaintiff, the Court may consider "materials outside the complaint to the extent that they are consistent with the

allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (quotation marks omitted), including, "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted), statements by the plaintiff "submitted in response to [a] defendant's request for a pre-motion conference," *Jones v. Fed. Bureau of Prisons*, No. 11-CV-4733, 2013 WL 5300721, at *2 (E.D.N.Y. Sept. 19, 2013), and "documents either in [the] plaintiff[']s possession or of which [the] plaintiff[] had knowledge and relied on in bringing suit," C*hambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quotation marks omitted).

### 2.  Rule 12(b)(3)

On a motion to dismiss a complaint under Rule 12(b)(3) for improper venue, "the plaintiff bears the burden of establishing that venue is proper." *Ne. Landscape & Masonry Assocs., Inc. v. State of Conn. Dep't of Labor*, No. 14-CV-9104, 2015 WL 8492755, at *2 (S.D.N.Y. Dec. 10, 2015) (quoting *Fedele v. Harris*, 18 F. Supp. 3d 309, 316 (E.D.N.Y. 2014)). In analyzing a claim of improper venue, the court must view all facts in the light most favorable to the plaintiff. *See Phillips v. Audio Active Ltd.,* 494 F.3d 378, 384 (2d Cir. 2007).  Thus, a "[c]ourt must accept the facts alleged in the complaint and construe all reasonable inferences in the plaintiff's favor." *Ne. Landscape*, 2015 WL 8492755, at *2 (citation and quotation marks omitted).

The permissible venue in this Action is determined by the general venue provision for cases involving a federal question. *See* 28 U.S.C. § 1391(b).  Under that statute, venue can be laid "in either (1) the district of the defendant's residence; (2) the district where a substantial part of the events giving rise to the claim occurred; or (3) if neither of those can be applied, any

district where a defendant is subject to personal jurisdiction." *Ne. Landscape*, 2015 WL 8492755, at *2 (citation and quotation marks omitted). "[W]hen a plaintiff relies on [§] 1391(b)(2) to defeat a venue challenge," a district court must engage in a two-step inquiry: first, the court must "identify the nature of the claims and the alleged acts or omissions giving rise to the claims"; and second, the court must "determine whether a substantial part of the acts or omissions occurred in the district where the suit was filed." *Fedele*, 18 F. Supp. 3d at 316 (citing *Daniel v. Am. Bd. of Emergency Med.,* 428 F.3d 408, 432 (2d Cir. 2005)). For venue to be proper under § 1391(b)(2), "*significant* events or omissions *material* to the plaintiff's claim must have occurred in the district in question, even if other material events occurred elsewhere." *Gulf Ins. Co. v. Glasbrenner,* 417 F.3d 353, 357 (2d Cir. 2005) (emphasis in original). However, "[w]hen considering a motion to dismiss for improper venue under Rule 12(b)(3), 'the plaintiff need only make a prima facie showing of venue.'" *Dash v. Bank of Am. Corp.*, No. 18-CV-4807, 2019 WL 1780140, at *4 (S.D.N.Y. Apr. 23, 2019) (italics omitted) (quoting *Gulf Ins. Co.*, 417 F.3d at 355). Where venue is improper, a court "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." *Fedele*, 18 F. Supp. 3d at 319 (quoting 28 U.S.C. § 1406(a)); *see also Daniel*, 428 F.3d at 435 (noting that a court must decide whether to "simply affirm dismissal on these [improper venue] grounds or, in the interest of justice, order transfer of the action to another district where jurisdiction and venue properly obtain" (citation omitted)).

Even where venue is proper, a court may, "[f]or the convenience of parties and witnesses, in the interest of justice, . . . transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). In determining whether to transfer, courts should first inquire "whether the

action could have been brought in the proposed transferee forum." *Solar v. Annetts*, 707 F. Supp. 2d 437, 442 (S.D.N.Y. 2010) (citation and quotation marks omitted). Second, courts should determine "whether the transfer would promote the convenience of parties and witnesses and would be in the interests of justice." *Id.* (citation and quotation marks omitted). With regard to the second prong, courts weigh the following factors: "(1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of the parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, and (7) the relative means of the parties." *N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 112 (2d Cir. 2010) (citation and quotation marks omitted). On a motion to transfer venue pursuant to § 1404(a), the "burden rests on the moving party to make a clear and convincing showing that the balance of these factors favors their choice of forum." *Lapa v. Massage Envy Franchising, LLC*, No. 18-CV-7403, 2019 WL 2004072, at *2 (S.D.N.Y. May 7, 2019) (citation and quotations omitted). Generally, the plaintiff's choice of forum "weighs heavily against transfer." *Marshall v. Annucci*, No. 16-CV-8622, 2018 WL 1449522, at *11 (S.D.N.Y. Mar. 22, 2018); *see also Gross v. British Broad. Corp.*, 386 F.3d 224, 230 (2d Cir. 2004) ("[A] plaintiff's choice of forum is presumptively entitled to substantial deference." (citation omitted)).

### B. Analysis

Defendants argue that Plaintiff's Amended Complaint is in violation of Federal Rule of Civil Procedure 8 due to its length, the number of attached exhibits, and the fact that it is "excessively long, verbose, and convoluted." (Defs.' Mem. 5–6.) Defendants also argue that Plaintiff has sued certain Defendants only in their official capacities, and, therefore, Plaintiff's damages claims against these Defendants are barred by the Eleventh Amendment. (*Id.* at 6.)

Finally, Defendants argue that because Greene is located in the Northern District of New York, all of the claims related to incidents at Greene, or against Defendants who work at Greene or the DOCCS headquarters in Albany, must be dismissed for lack of venue or, in the alternative, the Court should issue an order severing the claims that arose at Greene and transferring venue to the Northern District of New York.  (*Id.* at 2, 7–15.)

       1.  Rule 8

Rule 8 requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Further, "[e]ach allegation must be simple, concise, and direct."  Fed. R. Civ. P. 8(d)(1).  Other courts have held that "[c]omplaints that are rambling, repetitious, and unnecessarily voluminous fail to meet the minimum requirements of Rule 8(a), because unnecessary prolixity in pleading places an unjustified burden on the court and on the party who must respond to it because they are forced to select the relevant material from a mass of verbiage."  *Benzo v. N.Y. State Div. of Human Rights*, No. 95-CV-5362, 1997 WL 37961, at *3 (S.D.N.Y. Jan. 31, 1997) (citation, alteration, and quotation marks omitted), *aff'd*, 141 F.3d 1151 (2d Cir. 1998).  Nevertheless, while "the [C]ourt has the power, on its own initiative or in response to a motion by the defendant . . . to dismiss the complaint[,] [d]ismissal . . . is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised."  *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) (citation omitted).

Plaintiff's Amended Complaint is undoubtedly lengthy—it is 70 pages long, contains 160 numbered paragraphs, 16 additional pages after those paragraphs, and 523 pages of exhibits.  (*See generally* Am. Compl.)  However, Plaintiff's Amended Complaint is not in violation of Rule 8, and the Court will not dismiss the Amended Complaint on this basis.  *See Perkins v.*

*Perez*, No. 17-CV-1341, 2019 WL 1244495, at *3–4 (S.D.N.Y. Mar. 18, 2019) (denying a motion to dismiss a 131-page complaint on the basis of Rule 8); *Kamdem-Ouaffo v. Balchem Corp.*, No. 17-CV-2810, 2018 WL 4386092, at *10 (S.D.N.Y. Sept. 14, 2018) (denying a motion to dismiss a 392-page complaint with 2,338 numbered paragraphs on the basis of Rule 8). The Court "remain[s] obligated to construe a pro se complaint liberally," *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (citation and italics omitted), and "dismissal of a pro se claim as insufficiently pleaded is appropriate only in the most unsustainable of cases," *Boykin v. KeyCorp*, 521 F.3d 202, 216 (2d Cir. 2008) (italics omitted). The Second Circuit has explained that "[t]his policy of liberally construing pro se submissions is driven by the understanding that '[i]mplicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect pro se litigants from inadvertent forfeiture of important rights because of their lack of legal training.'" *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir. 2006) (second alteration in original) (citation omitted).

Thus, instead of deciding whether the Amended Complaint is "short and plain" or "simple, concise, and direct," Fed. R. Civ. P. 8(a)(2), (d)(1), the Court considers whether the Amended Complaint gives "fair notice" to Defendants. *Salahuddin*, 861 F.2d at 42; *see also Wynder v. McMahon*, 360 F.3d 73, 79 (2d Cir. 2004) ("The key to Rule 8(a)'s requirements is whether adequate notice is given." (citation omitted)); *Simmons v. Abruzzo*, 49 F.3d 83, 86 (2d Cir. 1995) ("The function of pleadings under the Federal Rules is to give fair notice of the claim asserted." (citation and quotation marks omitted)). "Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial." *Id.* (citation and quotation marks omitted). "Thus, the Court will not dismiss a complaint that may be prolix or even

unintelligible unless the complaint's form or substance prevents the defendant[s] from forming a fair understanding of the plaintiff's allegations or otherwise prejudices the defendant in responding to the complaint." *Perkins*, 2019 WL 1244495, at *4 (citation and quotation marks omitted).

Plaintiff's Amended Complaint provides fair notice of the claims asserted against Defendants. The Amended Complaint contains the usual sections, including a list of Defendants, their titles, and their addresses, (Am. Compl. 2–6); a statement on jurisdiction and venue, (*id.* at 6); a summary of Plaintiff's claims, (*id.* at 6–8); a mostly chronological description of the alleged facts and claims, which occurred over the span of several years, (*id.* at 8–53); details on Plaintiff's alleged injuries, (*id.* at 53); general descriptions of Plaintiff's various claims, (*id.* at 55–61); and a statement on the types of relief sought, (*id.* at 61–68). The Amended Complaint also contains a statement on Plaintiff's exhaustion attempts, (*id.* at 54–55), and the document itself is typed and numbered throughout. Additionally, although Plaintiff does attach a large volume of exhibits, the Amended Complaint provides guidance as to the relevance of each exhibit to Plaintiffs' claims. Therefore, "even if some portions of the Amended Complaint contain a number of arguably confusing or irrelevant paragraphs, and contain sections that are repetitive and certain exhibits that may not be apparent, the Court cannot say that the Amended Complaint fails to put Defendants on fair notice of Plaintiff's claims." *Perkins*, 2019 WL 1244495, at *4 (citation, alterations, and quotation marks omitted).

### 2. Eleventh Amendment

Defendants note that Plaintiff has sued certain Defendants only in their individual capacities, thus arguing that Plaintiff's damages claims against these Defendants are barred by the Eleventh Amendment—specifically, Defendants Dugon, B. Smith, Hammond, D. Smith,

Cole, Reyes, Steinbach, Mauro, Gambino, Heywood, TenEyck, Vogel, Crockwell, Annucci, McKoy, McGrath, Vann, MacTavish, Bellamy, Vulcano, and Bruen. (Defs.' Mem. 6.) However, Plaintiff states that he intended to sue these Defendants in their individual capacities as well but made a mistake when he did not denote as much in his Amended Complaint. (Pl.'s Mem. 7–8.) The Court construes Plaintiff's statement as a request for leave to file a Second Amended Complaint ("SAC") that would cure the deficiencies raised by Defendants and name all Defendants in their official and individual capacities. Because this is the first adjudication of Plaintiff's claims, the Court grants Plaintiff's request to file an SAC that brings suit against all Defendants in their individual and official capacities.

### 3. Venue

Plaintiff alleges that while at Sing Sing, he was retaliated against for filing complaints and grievances related to the processing of his FRP application and removal from his "program" at the law library. (*Id.* at 1.) Plaintiff also alleges that on September 25, 2015, he was transferred to Greene in retaliation for the grievances he filed. (*Id.* at 3–4.) Plaintiff raises numerous allegations related to his time at Greene, including, inter alia, inadequate conditions, imposition of sanctions without due process, due process violations with respect to filing grievances, and a racially discriminatory transfer policy. (Am. Compl. 58, 60.) Plaintiff argues that his claims related to Greene and Defendants who work at Greene or DOCCS headquarters should not be severed and transferred or dismissed for improper venue, because the "[Greene] Defendants opted to cover-up the malicious retaliation transfer sparked by the [Sing Sing] [D]efendants . . . by claiming that Plaintiff's transfer . . . was based upon the false allegation of his need of a flat facility." (Pl.'s Mem. 8–9.) Defendants argue that venue cannot be established in the Southern District for claims that arise out of incidents at Greene because the relevant

Greene Defendants reside in the Northern District,[6] and that is also where a "substantial part of the events" occurred. (Defs.' Mem. 7–11.)

> Under 28 U.S.C. § 1391(b), venue is appropriate in:
>
> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought . . . , any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b). For purposes of venue, state employee defendants are considered residents of the district in which they work. *See Smolen v. Brauer*, 177 F. Supp. 3d 797, 801 (W.D.N.Y. 2016). The Sing Sing Defendants accordingly reside in the Southern District of New York, and the Greene Defendants reside in the Northern District of New York. Because all Defendants are residents of New York, this makes both the Northern and Southern Districts proper venues under § 1391(b)(1), as venue is appropriate in a judicial district "in which *any* defendant resides, if all defendants are residents of the State in which the district is located." 28 U.S.C. § 1391(b)(1) (emphasis added); *see Miller v. Annucci*, No. 17-CV-4698, 2019 WL 4688539, at *9 (S.D.N.Y. Sept. 26, 2019) (finding that, because the plaintiff brought a case against state official defendants located at prisons in both the Southern and Northern Districts of New York, and all defendants were residents of New York, venue was proper in *both* the Southern and Northern Districts);

---

[6] Defendants who work at Greene or DOCCS in Albany are: Hale, Dugon, B. Smith, Hammond, D. Smith, Cole, Reyes, Steinbach, Mauro, Gambino, Heywod, TenEyck, Vogel, Crockwell, Annucci, McKoy, McGrath, Vann, MacTavish, Bellamy, Vulcano, and Bruen (the "Greene Defendants"). (Defs.' Mem. 8.) Although not included in Defendants' list of Greene Defendants, (*id.*), the Court assumes that Kusisto is also a Greene Defendant, as the address Plaintiff provided for him is at Greene, and the allegations against him appear to have occurred at Greene. (Dkt. No. 53; Am. Compl. ¶¶ 59–61.) Defendants who work at Sing Sing are Malin, Capra, Banks, Mason, Mitchell, Quick, Reid, and Bartleson (the "Sing Sing Defendants"). (Defs.' Mem. 9.)

*Randle v. Alexander*, 960 F. Supp. 2d 457, 486 (S.D.N.Y. 2013) ("[Section] 1391 permits a plaintiff to bring an action in a judicial district in which *any* defendant resides, so long as all defendants are residents of the [s]tate in which the district is located . . . ." (emphasis in original)). Thus, the Court denies Defendant's Motion to dismiss the Action for improper venue.

In the alternative, Defendants request that the Court transfer Plaintiff's claims against the Greene Defendants to the Northern District of New York. (Defs.' Mem. 11–15.) Courts may, in their discretion, "sever and transfer a claim against one or more defendants where the administration of justice would be materially advanced thereby." *See Randle*, 960 F. Supp. 2d at 486 (citation and quotation marks omitted). When determining whether to sever and transfer, a court should examine:

> (1) whether the issues sought to be tried separately are significantly different from one another, (2) whether the separable issues require the testimony of different witnesses and different documentary proof, (3) whether the party opposing the severance will be prejudiced if it is granted[,] and (4) whether the party requesting the severance will be prejudiced if it is not granted.

*Id.* (citation and quotation marks omitted). After engaging in the two-step inquiry described in *Solar*, the Court concludes that it is proper under 28 U.S.C. § 1404(a) to sever and transfer some of Plaintiff's claims against some of the Greene Defendants to the Northern District. *See* 707 F. Supp. 2d at 442. The first step of the § 1404(a) evaluation is met because Plaintiff could have brought claims related to the Greene Defendants and his incarceration at Greene in the Northern District under 28 U.S.C. § 1391(b). Further, even after "giving due deference to [Plaintiff's] choice of forum, this Court finds that the balance of convenience and justice weighs heavily in favor of" transfer of claims against some of the Greene Defendants to the Northern District of New York. *Id.* (citation, alteration, and quotation marks omitted).

First, Plaintiff's claims are separable and arise from different issues of fact involving different witnesses and sources of proof. "The locus of operative facts is a primary factor in

determining whether to transfer venue," *Steck v. Santander Consumer USA Holdings Inc.*, No. 14-CV-6942, 2015 WL 3767445, at *6 (S.D.N.Y. June 17, 2015) (citation and quotation marks omitted), and "[i]n determining the locus of operative facts, courts look to the site of the events from which the claim arises," *Mastr Asset Backed Secs. Tr. 2007-WMC1 v. WMC Mortg. LLC*, 880 F. Supp. 2d 418, 423 (S.D.N.Y. 2012) (citation and quotation marks omitted). With respect to Plaintiff's incarceration at Sing Sing, Plaintiff raises allegations of discrimination and due process violations in connection with his FRP participation, removal from the law library program, and filing of grievances related to these allegations. (Am. Compl. ¶¶ 29–35; *id.* at 55–56.) All such claims are related solely to Plaintiff's time at Sing Sing, and involve only Sing Sing Defendants. Further, Plaintiff's claims of retaliatory transfer also arise out of Sing Sing. *See Twitty v. Ashcroft*, No. 04-CV-410, 2008 WL 346124, at *2 (D. Conn. Feb. 4, 2008) (finding that a claim of retaliatory transfer arose at the prison from which the plaintiff was transferred).

The remainder of Plaintiff's claims arose after his transfer on September 25, 2014, and relate to his incarceration at Greene and the alleged actions—or inactions—of a group of nearly all Greene Defendants. Almost all of the Greene-related claims do not involve the Sing Sing Defendants, and there do not appear to be common questions of fact between the two groups. For example, Plaintiff's claims regarding the conditions of his confinement, medical treatment, discriminatory transfer policies, and due process violations with respect to filing grievances after his transfer all arose at Greene and involve solely the Greene Defendants. (Am. Compl. ¶¶ 38–105, 111–60.) Further, although Plaintiff filed grievances at Greene related to his alleged retaliatory transfer, and argues that the Greene Defendants "opted to cover-up the malicious retaliation transfer sparked by the [Sing Sing] [D]efendants," (Pl.'s Mem 9), this "does not change the fact that the [Northern] District[] of New York [is] the . . . loc[us] of operative facts

relating to" the filing of such grievances, *Miller*, 2019 WL 4688539, at *9 (some alterations in original) (citation and quotation marks omitted). Plaintiff filed his grievances while at Greene, and the grievances and related requests for medical records were reviewed and investigated by Greene Defendants. *See id.* (severing and transferring claims that arose in the Northern District from those that arose in the Southern District, even when the plaintiff filed grievances related to events that occurred in one district in the other district); *Melendez v. Wilson*, No. 04-CV-73, 2006 WL 2621083, at *10 (S.D.N.Y. Sept. 12, 2006) (severing and transferring claims to the Northern District, even when those claims related to alleged retaliation for grievances filed in the Southern District). Further, Plaintiff has not alleged any specific facts to suggest that Defendants at Greene worked *together* with Defendants at Sing Sing to cover up the reasons for his transfer, other than to suggest that the Greene Defendants "affirm[ed] and condon[ed] the discriminating action by each [Sing Sing] [D]efendant." (Am. Compl. 58.) *See James v. Osbourne*, No. 11-CV-4182, 2012 WL 4849131, at *5–6 (E.D.N.Y. Apr. 18, 2012) (finding that although the plaintiff generally alleged that staff at certain facilities "worked together" to retaliate against him, because the plaintiff did not "allege any factual basis" to suggest that the various staff members were "engaged in a conspiracy" or acting in retaliation, transfer of certain claims was proper), *adopted by* 2012 WL 4849160 (E.D.N.Y. Oct. 11, 2012).

Further, Plaintiff is "currently incarcerated at [Greene] in the [Northern] District of New York . . .[,] meaning this critical factor weighs in favor of transfer." *Solar*, 707 F. Supp. 2d at 442 (citation omitted). The Greene Defendants also reside in the Northern District, and there are no allegations that it would be more convenient for them to come to the Southern District of New York. *See Smolen*, 177 F. Supp. 3d at 802. Because of the convenience of electronic production, "[t]he location of relevant documents and the ease of access to sources of proof is mostly a

neutral factor," *Tlapanco v. Elges*, 207 F. Supp. 3d 324, 330–31 (S.D.N.Y. 2016), and even if the Court were to consider it, any related documents pertaining to Plaintiff's allegations while at Greene would presumably be located in the Northern District. Further, Plaintiff does not set forth in his Memorandum any argument or documentation that "there are witnesses who would not voluntarily testify in the Northern District or that litigating in the Northern District would be financially burdensome; therefore, these two factors are neutral." *Miller*, 2019 WL 4688539, at *10 (citation and quotation marks omitted). Were Plaintiff's claims against the Greene Defendants to be litigated in this Court, nearly 20 Defendants from the Northern District would need to travel to the Southern District to defend against allegations, and numerous witnesses would also presumably need to travel to White Plains. *See James*, 2012 WL 4849131, at *6 (considering similar factors and concluding that severance and transfer of venue was appropriate). Lastly, although Plaintiff opposes the transfer of any of his claims, a transfer may actually facilitate Plaintiff's Action, and his claims "may all proceed more expeditiously as they move forward as separate actions." *Salgado v. N.Y. State Dep't of Corrs. and Cmty. Supervision*, No. 13-CV-1108, 2018 WL 1663255, at *3 (W.D.N.Y. Apr. 6, 2018). For example, the separate actions will involve fewer defendants, claims, and discovery. *Id.* "Indeed, evidence of multiple constitutional claims against numerous defendants in [two] different facilities at different times may result in juror confusion or spillover prejudice." *Id.*

However, Plaintiff's claims against MacTavish, Vann, and Heywood will remain in the Southern District. Although residents of the Northern District, Plaintiff's claims against MacTavish and Vann relate to his alleged retaliatory transfer, as Plaintiff appears to allege that MacTavish and Vann were involved in deciding to transfer him from Sing Sing by, for example, reviewing Plaintiff's records before his transfer was approved. (Am. Compl. ¶¶ 83, 147; *id.* at

55–58, 59–61.)  Therefore, because the "locus of operative facts," *N.Y. Marine & Gen. Ins. Co.*,

599 F.3d at 112 (citation omitted), related to Plaintiff's claim of retaliatory transfer is Sing Sing,

the issues to be tried against MacTavish and Vann are not fully separable from Plaintiff's

retaliatory transfer claim.  Additionally, there is nothing in the limited record to suggest that

MacTavish and Vann would be "unduly inconvenienced by having to present testimony in the

Southern District of New York."  *Marshall*, 2018 WL 1449522, at *12.

Similarly, Plaintiff alleges that Mitchell "deprived Plaintiff of access to litigation material

. . . that would have established during the administrative proceeding that all of [Defendants']

allegations for transferring . . . Plaintiff . . . were false and in retaliation."  (Am. Compl. 60.)[7]

Plaintiff brings a similar claim against Heywood, who affirmed Mitchell's response to Plaintiff's

FOIL requests after Plaintiff filed a grievance.  (*Id.*)  It appears from the Amended Complaint

that Plaintiff may intend to assert a procedural due process violation, or a claim of retaliation,

against both Heywood and Mitchell.  (*Id.*)  Although Plaintiff's claims against Mitchell arose

while Plaintiff was at Greene, Mitchell is a Sing Sing Defendant, and it is presumably more

convenient for him if these claims remain in the Southern District.  Further, assuming that

Mitchell reviewed Plaintiff's FOIL request at Sing Sing, most of the evidence and documents

related to this claim likely reside in the Southern District, given that Plaintiff requested

documents related to his transfer to Greene.  Moreover, Plaintiff's FOIL request-related claims

---

[7] Although Plaintiff initially sent his FOIL request to Capra, another Sing Sing
Defendant, Plaintiff does not appear to assert this claim against him in his Amended Complaint.
(Am. Compl. ¶¶ 106–07 ("By FOIL request dated January 1, 2016, Plaintiff sought from . . .
Capra . . . the following documents . . . .  By response letter dated January 15, 2016, . . . Mitchell
. . . denied Plaintiff the following documents . . . ."); *id.* at 60 ("The actions by . . . Mitchell and
Heywood were arbitrary, capricious[ ,] and designed to deprive Plaintiff access to litigation
material, documents, records[,] and the names of . . . MacTavish and . . . Vann . . . .").

against Mitchell are separable from the claims about his HIPAA requests, which were all made to Northern District Defendants and were solely for medical records. (*See id.* ¶¶ 106–42.) Finally, although keeping the FOIL request-related claims in the Southern District may require Heywood to travel to defend the case, Plaintiff's claims with respect to Heywood are fairly limited, particularly in comparison to the length and detail of his Amended Complaint, and transferring these claims to the Northern District would then require Mitchell to travel. *See Marshall*, 2018 WL 1449522, at *12 (noting that there was no justification offered for "why the burden of traveling should be shifted from the parties outside of the Southern District of New York to the parties that do reside in this district" (citation omitted)).[8]

Accordingly, all claims related to Plaintiff's incarceration at Greene and against the Greene Defendants, with the exception of Heywood, MacTavish, and Vann, are severed and transferred to the Northern District of New York. All claims related to Plaintiff's incarceration at Sing Sing, alleged retaliatory transfer, and FOIL request to Mitchell, including those claims against Heywood, MacTavish, and Vann, will remain in the Southern District.

### III. Conclusion

For the reasons stated above, Defendants' Motion To Dismiss is granted in part and denied in part. All claims related to Plaintiff's incarceration at Greene and the Greene

---

[8] Plaintiff brings one additional claim against both Sing Sing and Greene Defendants, alleging that Bartleson, Vulcano, Kusisto, and Hale "place[d] false and misleading information in Plaintiff's file of an alleged negative removal of program." (Am. Compl. 60.) However, given that Bartleson is an employee of Sing Sing, and Vulcano, Kusisto, and Hale are not, these allegations do not appear to have arisen from the same set of facts. For example, Plaintiff's allegations related to false statements made by Hale appear to be based on grievance decisions issued by Hale, (*id.* ¶ 92), while Plaintiff's allegations related to Bartleson's false statements appear to be based on a memorandum that Bartleson sent Plaintiff informing Plaintiff that he would be removed from his program, (*id.* ¶ 29).

Defendants, with the exception of Plaintiff's claims against Defendants Mitchell, Heywood, MacTavish, and Vann, are severed and transferred to the Northern District of New York. Plaintiff's claims related to his incarceration at Sing Sing and against Defendants Mitchell, Heywood, MacTavish, and Vann are to remain in this District.

If Plaintiff wishes to file a second amended complaint against the Defendants who Plaintiff intends to sue in their official and individual capacities, Plaintiff must do so within 30 days of the date of this Opinion. Plaintiff is advised that the second amended complaint will replace, not supplement, all prior complaints. The second amended complaint must contain all of the claims, factual allegations, and exhibits that Plaintiff wishes the Court to consider. Failure to file a second amended complaint may result of dismissal of certain of Plaintiff's claims with prejudice.

The Clerk of the Court is respectfully directed to terminate the pending Motion, (Dkt. No. 67), and mail a copy of this Opinion to Plaintiff.

SO ORDERED.

DATED:     March 25, 2020
           White Plains, New York

_____
KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE